COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



|  | § |  |
|---|---|---|
| HECTOR ENRIQUE ASTORGA, | § | No. 08-16-00285-CR |
| Appellant, | § | Appeal from |
| v. | § | 409th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20100D03164) |
|  | § |  |

## **O P I N I O N**

A jury convicted Appellant Hector Enrique Astorga for the offense of murder. After filing a post-conviction application for writ of habeas corpus, Appellant was granted an opportunity to file this out-of-time appeal. In three issues, Appellant challenges the adequacy of the indictment, the trial court's jury charge, and the evidence. We conclude the indictment and the trial court's charge were proper, and although Appellant has failed to adequately brief his third issue in compliance with Rule 38.1(i), we have conducted a sufficiency review and conclude the evidence supports his conviction. TEX.R.APP.P. 38.1(i). We affirm the trial court's judgment.

## **BACKGROUND**

Appellant rented a room in Jose Pichardo's El Paso home. On the morning of April 8, 2009, Appellant called 9-1-1, reported that someone had "died on me," after finding his approximately 70-year old friend, Jose Pichardo, laying down, bleeding. In response to

questioning, Appellant reported that he did not know what had happened to Jose, and had entered Jose's room after not hearing anything. Appellant stated that Jose was bleeding and there was a lot of blood. When the 9-1-1 dispatcher asked Appellant whether Jose had been hit with something, Appellant replied that he did not know because Appellant had not been at the residence and had been out the preceding night. Appellant informed the dispatcher that he had left earlier that same morning to pick up his phone, and when he returned, he did not hear any noise at the residence. Appellant entered Jose's room to check on him and discovered Jose laying down and swollen. When the dispatcher asked Appellant whether Jose was sick, Appellant stated that Jose was a sick diabetic who did not take his medicine and was in "bad shape." Appellant then informed the dispatcher that a body bag was needed.

The dispatcher transferred Appellant's call to the Fire Department to describe the medical emergency. Appellant stated that there was a dead man in his 70s at his house, and confirmed that he had found Jose dead, cold to the touch, with no pulse. When the medical dispatcher asked whether Jose had been sick, Appellant stated that Jose had been sick and was a diabetic. The medical dispatcher deployed responsive units to the site. When asked whether he wanted to try CPR, Appellant declined to do so and stated that Jose had no pulse. When the dispatcher asked for Appellant's phone number, he reported that he did not have one and stated he was using someone else's phone.

Fire Department Lieutenant Jaime Pando responded and after Appellant guided him to a room in the residence, Lt. Pando saw that Jose's eyes were swollen shut, that blood had exited through Jose's nose, ears, and mouth, and believed Jose had been assaulted. Based on the location of blood in the room, Lt. Pando believed Jose may have been moved. When asked, Appellant

2

confirmed that he had moved Jose's body. Lt. Pando testified that he knew that Jose was dead, but asked Paramedic Luis Cavazos to check for vital signs.

El Paso Police investigated the scene and the medical examiner who responded confirmed that Jose's death was a homicide. Before Appellant was considered a suspect, Detective Joe Ochoa spoke with Appellant as a witness in the detective's unmarked vehicle located outside of the residence. Detective Ochoa observed that a strong odor of alcohol was emanating from Appellant, who smelled as if he was hungover. Appellant stated that his mother was present, and explained to Detective Ochoa that he had been out the night before on his own, had gone to Jaguars nightclub, returned home at about 2:00 or 2:30 in the morning, and noticed that his roommate of less than one year, Jose, was in his own bedroom because the door was closed. He did not inform the detective at that time that he had gone out with anyone on the preceding evening. Appellant informed Detective Ochoa that he had awakened at approximately 7:30 that morning, traveled downtown, and noticed when he returned at about 10 a.m. that Jose's door was closed. Appellant stated that he was concerned, entered the bedroom, and found Jose in his undergarments, not doing well, and noticed there was blood. Appellant informed Detective Ochoa that he had tried to render aid but Jose felt cold to the touch. Appellant said he had bloodied his own clothing, removed it, and put the clothing in his room. Appellant left to speak with his mother and returned with her, and after she entered the house, she advised Appellant to call police.

Appellant agreed to provide a statement to Detective Ochoa at police headquarters. Before obtaining Appellant's statement, Detective Ochoa learned that the medical examiner had determined that Jose's death was a homicide, which he did not know when he was at the residence. Detective Ochoa believed the circumstances did not comport with the information Appellant had

3

provided, and decided to pre-interview Appellant. Although Appellant was not yet a suspect, at headquarters, Detective Ochoa observed that the knuckle area of Appellant's hands bore significant swelling and the outer area of Appellant's left hand was cut. Photos of Appellant's hands were taken, and were admitted in evidence at trial. During the pre-interview, Appellant recanted some portions of his earlier statements, and because Appellant was then considered a suspect, Detective Ochoa read Appellant his *Miranda* warnings before proceeding to interview Appellant along with Detective David Samaniego, and had Appellant sign the written *Miranda* warnings card provided to him.[1]

Detective Ochoa agreed that at the commencement of the interview at approximately 6 p.m., Appellant smelled only slightly of alcohol and appeared sober, not drunk. Detective Ochoa acknowledged that alcohol would not prevent a 47-year old man from beating a frail 67-year old man to death, and noted that alcohol changes a person's demeanor by making him either livelier, happier, or angrier.

Detective Ochoa recalled that Appellant informed him that that after Appellant had arrived home, Jose initiated a fight regarding the late time at which Appellant was returning home. Detective Ochoa recalled that Appellant claimed the fight was quick, not very rough, and that Jose went into his room and slept. Appellant acknowledged that he had thrown away some evidence, a portion of an ashtray that had been thrown, and had informed police that the trash was picked up that same day. Detective Samaniego stated that Appellant's bloody clothes that he was wearing when he moved Jose's body were found in the closet as Appellant had described, but acknowledged that Appellant had controlled the crime scene before police arrived, and agreed that

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed. 2d 694 (1966).

Jose's truck, which Appellant drove in the morning to get Appellant's mother, was capable of hauling off a lot of evidence.

At one point during the recorded interview, the detectives left the interview area, returned and allowed Appellant to use the restroom, and informed Appellant that he would be charged for the murder of Jose Pichardo. When the detectives re-watched the recording of Appellant's statement, which included the period when they had stepped out of the interview room, they observed Appellant state, "Fuck. I killed somebody." During the interview, Appellant informed the detectives that he struck Jose more than five times but was unsure how many times he actually struck Jose because his strikes were part of "a flurry."

Appellant was indicted for Jose's murder. Appellant did not testify at trial but recordings of Appellant's phone calls with 9-1-1 and El Paso Fire Department personnel, along with his video-recorded interview with El Paso detectives, were admitted in evidence.

In addition to emergency responders and law-enforcement personnel, several of Jose's neighbors testified at trial. Because the weather was hot, and their air conditioners were not on, Jose's neighbor, Maria, stated that both she and Jose had their bedroom and bathroom windows open. Before her alarm was scheduled to activate at 5:35 a.m., Maria could hear Jose arguing and instructing someone to leave the house and leave him alone, and then heard another male voice respond that he was not going to leave, and Jose repeatedly instructed the other person to leave. After the arguing ceased, Maria heard Jose coughing and making sounds as if he was trying to clear his throat of mucus for a period of about 15 minutes or longer. By 7:30 a.m., Maria no longer heard Jose's noises.

Another of Jose's neighbors heard two male voices arguing that morning between 5 and 6

5

a.m. A different neighbor who walked past the residence soon after 5 a.m. observed Appellant, who did not respond to her when she greeted him, bending outside the residence, away from the door. A third neighbor whose bedroom is located next to the side of Jose's house where his trashcans are located was awakened between 3 and 6 a.m. when she heard the lid of the trashcans opening and closing loudly from four to six times over a period of a couple of minutes, and then being rolled somewhere else. It was the day for garbage pickup in their neighborhood. Yet another neighbor described Appellant as being very big with a heavier big build, and described Jose as a thin, old man.

Through forensic testing, Jose's blood was confirmed as being on Appellant's clothing found in his room, and in other tested areas in the house. When asked to address the absence of Appellant's DNA being found anywhere, the forensic expert agreed that one would not expect to find a source of DNA from a person who is not bleeding or injured, and that a perpetrator's DNA would not be under the fingernails of a person who either does not defend himself or does not scratch the perpetrator. Only Jose's DNA, possibly from his own blood, was found under his fingernails.

The medical examiner who testified at trial, Dr. Juan Contin, stated that Jose was reported to be 66-years old. Jose was 5'11" tall, and weighed 148 pounds. A postmortem examination of Jose's body revealed swollen eyelids, hemorrhage inside the white of his eye, fracture of the nasal bone, several contusions to the front of his neck, extensive hemorrhage of the larynx, contusions to the center and to the right of his sternum, contusions to the front of his chest and on both biceps, several contusions inside his mouth, two lacerations to the inside of the lip which perforated "through and through," a laceration to his liver resulting from bi-lateral serial fracturing of ribs 2

6

through 11 on the left and right sides, subarachnoid hemorrhage in the brain, and aspiration of food which came from Jose's stomach, through his esophagus, and then into his windpipe and lungs. Photographs showed injuries consisting in part of bruising on Jose's right ankle, eye, ear, and neck, swelling of the eyes, an abrasion on the left lower eyelid, lacerations to and multiple bruises around and inside the lower lip, extensive bruising on the left side of the neck, bruising at the left ear canal, a swollen Adam's apple as well as swelling and discoloration on either side of his neck, bruising under his jaw, bruising to his chest and arms, abrasions to his left elbow, and bruising above and to the inside of his knee on his right thigh.

Dr. Contin noted a complete absence of defensive wounds, estimated that Jose suffered trauma caused by multiple severe blows, in excess of 10 or 15 and possibly more, and noted that some wounds, like those causing Jose's ribs to fracture, could have been cause by a single blow. Jose's blood tested positive only for caffeine.

The cause of Jose's death was blunt force traumata to the head and chest with aspiration. Dr. Contin explained that aspiration consists of food entering the lungs, interfering with the function of the lungs by obstruction of the airway, and can cause a person to die of asphyxia. He agreed that aspiration does not cause blunt force trauma, which may be caused by hands, fists, or feet, and that aspiration would be a secondary complication to the blunt force trauma Jose suffered. Of the more than 10,000 autopsies he had performed, Dr. Contin considered the beating Jose had suffered, with severe trauma to the brain and to the torso sufficient to cause aspiration, to be the worst he had ever seen, and noted that Jose's death would have been agonizing.

Appellant presented no defense witnesses. The jury found Appellant guilty, assessed punishment at 70-years' confinement, and assessed a fine of $10,000.00.

7

**DISCUSSION**

*Defective Indictment*

In Issue One, Appellant contends the state failed to set forth in the charging instrument the means, instrument, or weapon used, and thereby denied him fair notice of the offense for which he was charged. We express no opinion as to whether the indictment was defective. Appellant had an affirmative duty to object to any defect in the indictment before trial, and his failure to do so prevents him from raising a claim of a defect for the first time on appeal. TEX.CODE CRIM.PROC.ANN. § 1.14(b)(West 2005)("If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other postconviction proceeding."); *see Sanchez v. State*, 120 S.W.3d 359, 366–67 (Tex.Crim.App. 2003)(right to be charged by an instrument that is free of defects, errors, and omissions is neither a "systemic" requirement nor a "waivable" right, and any error in the charging instrument must be objected to in a timely and specific manner before trial). Issue One is overruled.

*Jury Charge Error*

Appellant was charged with murder by "intentionally and knowingly" causing the death of Jose, or alternatively, intentionally causing "serious bodily injury," thereby resulting in his death. At trial, Appellant requested jury instructions on the lesser-included offenses of manslaughter and criminally negligent homicide. The trial court declined to submit the instructions. In Issue Two, Appellant now contends that the trial court's denial of his requested instruction on criminally negligent homicide was in error. In support of his contention, Appellant notes that defense

8

counsel addressed criminally negligent homicide to the venire and to the jury, and suggests that the medical examiner's agreement with the statements, "Aspiration can't cause blunt force trauma[,]" and "[You] can't inflict aspiration[,]" supported the inclusion of his requested instruction on criminally negligent homicide within the trial court's charge to the jury.

Our resolution of a jury-charge issue involves two steps. We first determine whether error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex.Crim.App. 2012). If error does exist, we determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex.Crim.App. 2005). If the defendant objected to an erroneous charge at trial, as Appellant did in this case, he will obtain relief if the record shows that he suffered "some harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(op. on reh'g). In making this determination, we consider: (1) the jury charge as a whole; (2) the arguments of counsel; (3) the entirety of the evidence; and (4) other relevant factors present in the record. *Wooten v. State*, 400 S.W.3d 601, 606 (Tex.Crim.App. 2013). This standard requires the reviewing court to find that the defendant "suffered some actual, rather than merely theoretical, harm from the error." *Warner v. State*, 245 S.W.3d 458, 462 (Tex.Crim.App.2008).

We conduct a two-step *Aguilar/Rousseau* analysis to determine whether the trial court should have given the jury a lesser-included offense instruction. *State v. Meru,* 414 S.W.3d 159, 162 (Tex.Crim.App. 2013); *Cavazos v. State,* 382 S.W.3d 377, 382 (Tex.Crim.App. 2012). First, we must determine as a matter of law whether the requested instruction is indeed a lesser-included offense of the offense charged. *Meru,* 414 S.W.3d at 162; *Cavazos,* 382 S.W.3d at 382; *Hall v. State,* 225 S.W.3d 524, 535 (Tex.Crim.App. 2007). In making this determination, we compare the elements of the offense as alleged in the indictment with those of the requested lesser offense.

9

*Meru,* 414 S.W.3d at 162. This is a question of law that is independent of the evidence produced at trial. *Rice v. State,* 333 S.W.3d 140, 144 (Tex.Crim.App. 2011); *see also Meru,* 414 S.W.3d at 162. Second, as a question of fact, we must determine there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser offense. *See Meru,* 414 S.W.3d at 162-63, *citing Hall,* 225 S.W.3d at 536); *Guzman v. State,* 188 S.W.3d 185, 188-89 (Tex.Crim.App. 2006).

"[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a charge on a lesser offense." *Cavazos,* 382 S.W.3d at 385; *see also Meru,* 414 S.W.3d at 163. In determining whether the evidence presented at trial supported an instruction on a lesser-included offense, we may not consider whether the evidence presented was "credible, controverted, or in conflict with other evidence." *Moore v. State,* 969 S.W.2d 4, 8 (Tex.Crim.App. 1998).

Still, the evidence supporting an instruction on a lesser-included offense "must still be directly germane to the lesser-included offense[.]" *Cavazos,* 382 S.W.3d at 385; *see also Hampton v. State,* 109 S.W.3d 437, 441 (Tex.Crim.App. 2003)(evidence must be "directly germane" to lesser-included offense before an instruction on a lesser-included offense is warranted). Further, this "threshold requires more than mere speculation--it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos,* 382 S.W.3d at 385.

We agree with the State's candid acknowledgement that criminally negligent homicide is a lesser-included offense of murder. *See Saunders v. State,* 840 S.W.2d 390, 391 (Tex.Crim.App. 1992)(criminally negligent homicide is a lesser-included offense of murder). As such, the only issue for our consideration is whether there was any evidence presented at trial from which a

10

rational jury could have found Appellant guilty only of the lesser-included offense, and not guilty of the greater offense of murder. *Saunders,* 840 S.W.2d at 391.

Murder is statutorily defined as intentionally or knowingly causing the death of another, or alternatively, intentionally or knowingly causing serious bodily injury to another by committing an "act clearly dangerous to human life," resulting in that person's death. TEX.PENAL CODE ANN. § 19.02 (West 2011). A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX.PENAL CODE ANN. § 6.03(a)(West 2011). A person acts knowingly when he is aware of the nature of his conduct and that his conduct is reasonably certain to cause the result. TEX.PENAL CODE ANN. § 6.03(b).

A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. TEX.PENAL CODE ANN. § 19.05(a)(West 2011). A person acts with criminal negligence when he ought to be aware of a substantial and unjustifiable risk that the result will occur. TEX.PENAL CODE ANN. § 6.03(d). The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id*.

Under these definitions, Appellant would have been entitled to an instruction on criminally negligent homicide only if the record contains "some affirmative evidence" that Appellant did not intend to kill or cause serious bodily injury to his victim, thereby allowing a rational jury to find him not guilty of murder. In addition, there had to be "some affirmative evidence" from which a rational juror could have concluded that Appellant had the lesser mental state required for criminally negligent homicide, *i.e.,* that he ought to have, but did not, perceive that his conduct

11

would result in the victim's death. *See Villalba v. State,* No. 05-13-01661-CR, 2015 WL 1514453, at *4-5 (Tex.App.--Dallas Mar. 31, 2015, pet. ref'd)(mem. op., not designated for publication).

In attempting to satisfy this standard, Appellant notes that defense counsel explained criminally negligent homicide to the venire, and again to the jury during opening and closing arguments, and now asserts only that he was criminally negligent because he had a physical altercation with Jose, left Jose, and did not render aide nor seek emergency care for Jose. On appeal, Appellant does not direct us to "some affirmative evidence" showing that he was not guilty of murder nor does he direct us to any evidence from which a rational juror could have concluded that Appellant ought to have perceived, but did not perceive, that his conduct would result in Jose's death. *See Montgomery v. State*, 369 S.W.3d 188, 193 (Tex.Crim.App. 2012). Appellant does not direct us to affirmative evidence in the record that both raises the lesser-included offense and rebuts or negates an element of the greater offense. *Cavazos,* 382 S.W.3d at 385.

Having examined the record, we are unable to conclude that more than a scintilla of evidence shows that Appellant was unaware of the risk Appellant's conduct created when he beat and killed Jose. *See Mendieta v. State*, 706 S.W.2d 651, 653 (Tex.Crim.App. 1986)(record must contain evidence showing an unawareness of risk before a charge on criminally negligent homicide is required). For this reason, and because the evidence does not show that Appellant was only guilty of the lesser-included offense of criminally negligent homicide, the trial court did not err when it denied Appellant's requested instruction for that offense. Consequently, we need not conduct a harm analysis. Issue Two is overruled.

*Sufficiency of the Evidence*

In Issue Three, Appellant asserts the evidence was legally insufficient to support the jury's finding that he was guilty of murder. Appellant's argument is comprised of two sentences. In the first sentence, Appellant references, incorporates, and relies on his arguments in Issue Two which addressed jury charge error, and asserts that the evidence showed Appellant was criminally negligent when he participated in the homicide of "Sands." In his second sentence, which relies on the first, Appellant merely states, "As such, the testimony and physical evidence was legally insufficient to convict [Appellant] for murder."

The State asserts Appellant presents nothing for our review because he fails to direct us to inadequacies in the evidence to support his sufficiency challenge, references the homicide of a victim (Sands) whose death is not at issue in this case, and fails to provide citation to any legal authority in support of his assertions. We agree that Appellant has inadequately briefed his sufficiency contentions.

Texas Rule of Appellate Procedure 38.1 sets out the requisites for briefs. TEX.R.APP.P. 38.1. Although citation to authority is not required for all portions of a brief, Rule 38.1(i) requires that the argument portion of the appellant's brief contain a clear and concise argument for the contentions made. TEX.R.APP.P. 38.1(i). The rule also requires that the argument be supported with appropriate citations to the record and to authorities. *Id*. Compliance with the rule helps the appellant structure and present his issue based on the facts of the case and relevant law, and guides the reviewing court and other parties to understand both the contentions set out in the brief and the legal basis supporting the argument.

Appellant provides no clear or concise argument to support his assertion that the evidence

is legally insufficient to support his conviction. Although Appellant does set out a standard of review, he fails to apply that standard to the facts of his case. Moreover, Appellant provides no citation to any authority in support of his assertion that the evidence is legally insufficient.

In addressing briefing issues, Judge Cochran observed:

An appealing party's brief must contain a 'clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.' Failure to provide substantive legal analysis--'to apply the law to the facts'--waives the point of error on appeal. If the appealing party fails to meet its burden of adequately discussing its points of error, this Court will not do so on its behalf.

*Linney v. State*, 413 S.W.3d 766, 767 (Tex.Crim.App. 2013)(Cochran, J., concurring in refusal to grant petition for discretionary review)(internal citations omitted); *see* TEX.R.APP.P. 38.1(i); *see also Lucio v. State*, 351 S.W.3d 878, 896 (Tex.Crim.App. 2011); *Swearingen v. State*, 101 S.W.3d 89, 100 (Tex.Crim.App. 2003).

Appellant has failed to apply the law to the facts of his case to show that the evidence is legally insufficient to support his conviction for murder and has failed to adequately address this issue on appeal. Although we agree with Judge Cochran's observation and find the briefing on this issue to be non-compliant with Rule 38.1(i), we are reluctant to declare the issue waived in this case. We therefore proceed to determine whether the evidence was legally sufficient to support the jury's verdict and the trial court's judgment.

When addressing a challenge to the sufficiency of the evidence, we consider whether, after viewing all of the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex.Crim.App. 2017). Under this standard, we defer "to the responsibility of the trier of fact

14

fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781. We may not re-weigh the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). We must not engage in a "divide and conquer" strategy but must consider the cumulative force of all the evidence. *See Murray v. State*, 457 S.W.3d 446, 448 (Tex.Crim.App. 2015).

Although juries may not speculate about the meaning of facts or evidence, juries are permitted to draw any reasonable inferences from the facts so long as each inference is supported by the evidence presented at trial. *Cary v. State*, 507 S.W.3d 750, 757 (Tex.Crim.App. 2016), *citing Jackson*, 443 U.S. at 319, 99 S.Ct. 2781; *see also Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex.Crim.App. 2007). We presume that the fact finder resolved any conflicting inferences from the evidence in favor of the verdict, and we defer to that resolution. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex.Crim.App. 2012). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex.Crim.App. 2010). Direct evidence and circumstantial evidence are equally probative, and circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex.Crim.App. 2015); *Hooper*, 214 S.W.3d at 13.

We determine whether the evidence presented at trial was sufficient to support a conviction by comparing it to "the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). The hypothetically correct jury charge is one that "accurately sets out the law, is authorized by the indictment, does

15

not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.; *see also Daugherty v. State*, 387 S.W.3d 654, 665 (Tex.Crim.App. 2013). The "law as authorized by the indictment" includes the statutory elements of the offense and those elements as modified by the indictment. *Daugherty*, 387 S.W.3d at 665.

Under the indictment and statute, the State was required to show beyond a reasonable doubt that on or about April 8, 2009, Appellant intentionally or knowingly caused the death of Jose Pichardo by inflicting blunt force trauma to the head and /or chest of Jose Pichardo with aspiration, or with intent to cause serious bodily injury to Jose Pichardo, committed an act clearly dangerous to human life, to wit: inflicting blunt force trauma to the head and/or chest of Jose Pichardo with aspiration that caused the death of Jose Pichardo. *See* TEX.PENAL CODE ANN. § 19.02(b)(1), (2). The defendant's culpable mental state may be inferred from the extent of the victim's injuries. *Nisbett v. State*, 552 S.W.3d 244, 267 (Tex.Crim.App. 2018). Intent may also be inferred from the relative size and strength of the parties. *Patrick v. State*, 906 S.W.2d 481, 487 (Tex.Crim.App. 1995).

Witnesses testified that Jose was a tall, thin older man and described Appellant as big. During his recorded interview, Appellant admitted to detectives that he had struck Jose multiple times, and in the detectives' absence, Appellant declared that he had killed someone. Jose's neighbors heard male voices arguing, and one of them heard Jose coughing and making sounds as if trying to clear mucus from his throat. The medical examiner testified to the injuries Jose suffered which caused his death, which consisted of severe multiple blunt trauma to Jose's brain and to his torso. The injuries to Jose's torso were sufficient to cause aspiration. Dr. Contin, who

16

had performed more than 10,000 postmortem medical examinations, declared Jose's beating to be the worst he had observed.

Deferring to the fact finder's resolution of conflicting inferences and having viewed all the evidence in the light most favorable to the verdict, we conclude any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Issue Three is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

October 17, 2018
                              ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

17